Eliot H. LUMBARD, as Trustee of the Estate of Meritum Corporation, and David M. Green, as Trustee of the Estate of Carla Leather, Inc., Plaintiffs,

v.

MAGLIA, INC. (a/k/a "Carla Maglia, Inc."), Kalish, Rubinroit & Co., Brancorp Factors, Inc., Washington Druker, Aron Vaisman, Bernardo Druker, Hyman Rubinroit, Jack Lindner, Egidia Vaisman (a/k/a "Vivian Kopcow Vaisman"), Cristina Druker, and James Vaisman, Defendants.

No. 84 Civ. 0008 (GLG).

United States District Court, S.D. New York.

Nov. 12, 1985.

Cleary, Gottlieb, Steen & Hamilton, New York City, for plaintiffs, Richard F. Ziegler, Robert J. Stillman, of counsel.

Philip E. Silberberg, New York City, for defendant Washington Druker.

Wiener, Zuckerbrot, Weiss & Brecher, New York City, for defendants Brancorp Factors, Inc. and Jack Lindner; Irvin Rothfarb, Theresa Dunn Fougner, of counsel.

D'Amato & Lynch, New York City, for defendants Kalish Rubinroit & Co. and Hyman Rubinroit; Andrew R. Simmonds, of counsel.

## OPINION

GOETTEL, District Judge:

Before the Court are motions by the various defendants pursuant to Rules 12(b)(6), 9(b), and 12(f) of the Federal Rules of Civil Procedure. For the reasons stated below, these motions are denied.

**1.** Additional information about the developments in this and related proceedings is contained in this Court's opinion in *In re Carla*

## I. *Background*

The amended complaint alleges the following facts which we deem true for the purpose of evaluating the defendants' motions to dismiss.[1] *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

From 1975 until mid-1984, Carla Leather, Inc. ("Carla"), a New York corporation, manufactured, distributed, and sold women's leather apparel. Beginning in 1976, Meritum Corporation ("Meritum") acted as Carla's factor. Meritum held a continuing security interest in Carla's present and after-acquired inventory, products, and the proceeds thereof. Carla's two owner-principals, Washington Druker and Aron Vaisman, and their wives, personally guaranteed all of Carla's obligations to Meritum.

Despite increased sales throughout its operating history, Carla sustained substantial and steady operating losses. In early 1982, it became apparent that Carla could not repay its substantial Meritum debt nor could it survive without additional financing. Meritum and Carla jointly sought financing from an outside source and engaged in extensive negotiations to that end with another factor, defendant Brancorp Factors, Inc. ("Brancorp"). Defendant Jack Lindner, Brancorp's controlling officer, represented Brancorp in those negotiations. (Brancorp and Lindner are sometimes collectively referred to as "Brancorp".) Although Brancorp was willing to inject new funds into Carla, the negotiations broke down because Brancorp was unwilling to recognize Meritum's position as senior creditor. Carla was thus unable to locate a new source of financing. Carla considered commencing bankruptcy proceedings but rejected that alternative because it believed such proceedings would ultimately result in the liquidation of its assets for Meritum's benefit.

In May 1982, following Carla's and Meritum's unsuccessful joint efforts, Carla ceased operating and began liquidating its

*Leather, Inc.,* 50 B.R. 764, 766–69 (S.D.N.Y. 1985).

inventory and other assets. Carla's creditors, the largest of which was Meritum, were left with several million dollars in outstanding loans to Carla.

During the same period, Carla and others allegedly arranged for the creation of another entity—Carla Maglia ("Maglia")[2]—to carry on Carla's business purportedly free of Carla's debts. Maglia was incorporated on or about May 25, 1982. Washington Druker and Aron Vaisman allegedly engaged Washington Druker's brother, Bernardo Druker, to assume nominal ownership of Maglia. Maglia commenced operations managed by the same persons, making the same products, selling them to the same customers, purchasing goods from the same suppliers, operating out of the same premises, employing substantially the same personnel, and utilizing the same trade names as Carla. As part of this arrangement, Carla transferred to Maglia, for little or no consideration, the tangible and intangible assets necessary for the uninterrupted continuation of Carla's business. Within weeks of its inception, Maglia completed the successful accession to Carla's business by obtaining financing from defendant Brancorp.

Defendant Kalish, Rubinroit & Co. ("the Rubinroit firm") and its member Hyman Rubinroit were key participants in this allegedly fraudulent scheme. The Rubinroit firm, through Hyman Rubinroit, (collectively "Rubinroit") provided accounting and financial advisory services to Carla and has provided the same services to Maglia since its inception. Hyman Rubinroit was Carla's principal negotiator, spokesman, and accountant. He attended all or substantially all of the spring 1982 meetings between Carla and Meritum, Carla and Brancorp, and Carla and Meritum's banks. Thereafter, Rubinroit performed the same tasks for Maglia. During the time that Carla liquidated and transferred its assets, Rubinroit was simultaneously retained by Carla and Maglia. Rubinroit allegedly advised Washington Druker, Aron Vaisman, and

Bernardo Druker on how to conduct such transfers to avoid detection of the fraudulent scheme and arranged for Brancorp to finance Maglia.

Meritum filed a voluntary reorganization petition under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101–1174 (1982), on May 28, 1982. The bankruptcy court converted that Chapter 11 proceeding into a Chapter 7 proceeding, see U.S.C. §§ 701–766 (1982), on September 27, 1982. Following his appointment and confirmation as trustee of the Meritum estate, Elliot H. Lumbard (the "Meritum Trustee") commenced a one-year investigation into Meritum's affairs.

In January 1984, the Meritum Trustee brought this action against Maglia, Brancorp, Rubinroit, Vaisman, Washington Druker and others on claims arising out of those defendants' allegedly fraudulent scheme to transfer the income, assets, and business of Carla to Maglia. The Meritum Trustee sought recovery of Carla's debt to Meritum, which had allegedly grown to $12.2 million. Carla, by then an assetless shell, was joined as a nominal defendant.

Carla filed a voluntary petition for liquidation under Chapter 7 of the Bankruptcy Code on May 8, 1984, four months after the commencement of the Meritum action. The amended complaint alleges that Washington Druker and Brancorp arranged for this bankruptcy filing for the primary purpose of obstructing the Meritum action. They allegedly anticipated that the Carla bankruptcy trustee (the "Carla Trustee"), by virtue of a provision of the bankruptcy law, would displace the Meritum Trustee as the party in control of the claims in Meritum's action. Since the Carla estate had no assets, the defendants anticipated that the Carla Trustee would pursue these claims less effectively than would the Meritum Trustee.

On May 8, 1984, David M. Green was appointed by the United States Trustee to serve as interim trustee of the Carla estate.[3] On June 22, 1984, after completing a

---

**2.** In February 1983, Carla Maglia changed its name to Maglia, Inc.

**3.** Green has since been elected permanent trustee of the Carla estate. *See In re Carla Leather, Inc., supra,* 50 B.R. at 767–68.

one month investigation into Carla's affairs, Green, on behalf of the Carla estate, reached a settlement with the Meritum estate. The settlement provides that the Carla and Meritum Trustees will jointly prosecute the Meritum action dividing the eventual proceeds.[4] In conjunction with the settlement, the Meritum complaint has been amended to add the Carla Trustee as a joint plaintiff.

The amended complaint contains sixteen claims for relief, the first thirteen of which are the subject of motions now before us. The first claim seeks to recover Carla's debt to its creditors from Maglia, as Carla's successor. In the second and third claims, the plaintiffs seek to hold Rubinroit, Brancorp, Washington Druker, Aron Vaisman, and Bernardo Druker liable for Carla's debt for aiding and abetting and conspiring in the scheme to avoid Carla's creditors.

The fourth through seventh claims arise under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–65 (1982). These claims seek to recover treble the amount of Carla's debts from Maglia and from those who helped to transfer Carla's business to Maglia.

Claims eight through ten arise under Article 10 of New York's Debtor and Creditor Law, N.Y.Debt. & Cred. §§ 270–81 (McKinney 1945), and under Section 544(b) of the Bankruptcy Code, 11 U.S.C. §§ 544(b) (1982). These claims seek to recover the property transferred to Maglia—or its monetary equivalent. Claim eight is asserted against Maglia. The ninth and tenth claims are for conspiracy and aiding and abetting and are asserted against the defendants named in the second and third claims. Claims eleven and thirteen seek the turnover to the Carla estate of the Carla property that Maglia and Brancorp now possess. *See* 11 U.S.C. § 542 (1982). The twelfth claim alleges that Brancorp tortiously converted to its own use property in which Meritum had a security interest.

The moving defendants have directed a variety of motions at the amended complaint. Washington Druker has moved, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss the RICO claims in the amended complaint for failure to state a claim on which relief can be granted. Rubinroit joins in this motion. In the event that the RICO claims are dismissed, the moving defendants ask the Court to dismiss the remaining claims for lack of subject matter jurisdiction, or, alternatively, to abstain from hearing those claims. Defendant Brancorp moves to dismiss the second and third claims for failure to state a claim, and Brancorp moves to dismiss so much of the eleventh through thirteenth claims as rely on Meritum's security interest taking precedence over Brancorp's current interest in Maglia's property. Rubinroit joins in these motions, as does Washington Druker, to the extent that they apply to allegations of the amended complaint directed against him. Brancorp and Rubinroit also move pursuant to Fed.R.Civ.P. 9(b) to dismiss the fraud claims and the related aiding and abetting and conspiracy claims for failure to plead fraud with particularity. Brancorp and Rubinroit also move to strike certain allegations in the amended complaint or to disqualify the plaintiffs' litigation counsel pursuant to Model Code of Professional Responsibility DR 5–102(A) if these allegations are not stricken. Finally, the defendants variously challenge each trustee's standing to bring this action.

## II. *Discussion*

### A. Motions to Dismiss

#### 1. The RICO Claims

The defendants originally moved to dismiss each of the amended complaint's

---

**4.** The amended complaint asserts that when it became apparent that the Carla trustee had decided to cooperate with the Meritum trustee in prosecuting this action for the benefit of both estates, the defendants sought to unseat the Carla trustee and to thwart approval of the settlement agreement. This aspect of the continuing conspiracy has delayed the progress of this action and has required the Trustees to incur substantial additional expense in defending the settlement. The settlement has since been approved against Washington Druker's challenge. *In re Carla Leather,* 44 B.R. 457 (S.D.N.Y. Bankr.), *aff'd,* 50 B.R. 764 (S.D.N.Y.1985).

RICO counts. They asserted that the plaintiffs had not shown a distinct "racketeering injury" as required by *Sedima S.P. R.L. v. Imrex Co.*, 741 F.2d 482 (2d Cir. 1984), *rev'd*, ── U.S. ──, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), and by *Bankers Trust Co. v. Rhoades*, 741 F.2d 511 (2d Cir.1984), *vacated*, ── U.S. ──, 105 S.Ct. 3550, 87 L.Ed.2d 673 (1985). They also maintained that the plaintiffs had failed to establish another prerequisite to a civil RICO suit, a prior criminal conviction. *See Sedima S.P.R.L. v. Imrex Co., supra*, 741 F.2d at 496–504. The Supreme Court has since struck down both of these requirements. In *Sedima S.P.R.L. v. Imrex Co.*, ── U.S. ──, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the Court found "no support in the statute's history, its language, or considerations of policy for a requirement that a private treble damages action under § 1964(c) can proceed only against a defendant who has already been criminally convicted." *Id.* at 3284. It also held that "[t]here is no room in the statutory language for an additional, amorphous racketeering injury requirement." *Id.* The defendants' original objection to the RICO claims is deemed withdrawn.

■ In a letter dated August 29, 1985, the defendants raised a new objection to those claims. They asserted that the Second Circuit's recent decision in *Bennett v. United States Trust Co.*, 770 F.2d 308, 315 (2d Cir.1985), vitiated those claims.[5] The *Bennett* decision construed section 1962(c) of the RICO statute. That section states that

[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly

or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

11 U.S.C. § 1962(c) (1982). The *Bennett* Court held that in order to state a claim under section 1962(c), a complaint must identify an enterprise distinct from the person or persons (defendant(s)) who conduct the enterprise's affairs.

The amended complaint is consistent with this guidance. None of the RICO claims name an entity as both enterprise and as the defendant responsible for its conduct. In the fourth claim, the "enterprise" is Maglia. The defendants on that claim are those persons and entities who allegedly participated in the conduct of Maglia's affairs. Maglia is not a defendant on the fourth claim. In each of the three remaining RICO claims, Carla is named as the "enterprise." In none of those claims is Carla a defendant. Moreover, two of these claims do not involve violations of section 1962(c) upon which the *Bennett* court ruled. The defendants' motion to dismiss the RICO claims in the amended complaint is denied.[6]

#### 2. The Successor Liability Claims

Where one company sells or otherwise transfers all its assets to another company the latter is not liable for the debts and liabilities of the transferor, except where: (1) the purchaser expressly or impliedly agrees to assume such debts; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction is entered

---

**5.** In his moving memorandum, defendant Washington Druker asserted that the second, third, ninth, and tenth claims arise under RICO and should also be dismissed. In light of the recent developments in the law of RICO, we need not consider this somewhat bizarre assertion.

**6.** The defendants originally suggested that the Court voluntarily abstain from hearing this action pursuant to 28 U.S.C. § 1334(c)(1) (Supp. II 1984), which states that

[n]othing in this [jurisdictional] section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

*Id.* Since this Court has an independent basis of federal subject matter jurisdiction, and this proceeding does not arise only under Title 11, this abstention provision no longer applies.

into fraudulently in order to escape liability for such debts.

15 *Fletcher Cyclopedia of the Law of Private Corporations* § 7122 at 190 n. 1 (perm ed. 1983) (hereinafter *"Fletcher"*); *see also Ladjevardian v. Laidlaw-Coggeshall, Inc.,* 431 F.Supp. 834, 838 & n. 3 (S.D.N.Y.1977) (citing *Fletcher*); *Schumacher v. Richards Shear Co.,* 59 N.Y.2d 239, 451 N.E.2d 195, 198, 464 N.Y.S.2d 437, 440 (1983). The amended complaint seeks to hold Maglia, its co-conspirators, and those who aided and abetted it liable under each of these theories.[7] Strangely, only two of those theories are the subject of motions to dismiss the first claim for failure to state a claim on which relief can be granted.

The two theories that are the subject of the defendants' substantive motion, consolidation or merger and continuation, tend to overlap. Consequently, "no criteria can be identified that distinguish them in any useful manner."[8]  J. Phillips, *Product Line Continuity and Successor Corporation Liability,* 58 N.Y.U.L.Rev. 906, 909 (1983) [hereinafter *Successor Corporation Liability* ]. We shall refer to these collectively as the *"de facto* merger theory."

█ For a *de facto* merger to occur, there must be continuity of the successor and predecessor corporation as evidenced by (1) continuity of ownership; (2) a cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible; (3) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; and (4) a continuity of management, personnel, physical location, assets, and general business operation. *See Arnold Graphics Industries, Inc. v. Electronic Tabulating Corp.,* 775 F.2d 38 (2d Cir.1985) (listing factors); 15 *Fletcher,* supra, § 7165.5 at 339–40 (same); *Successor Corporation Liability, supra,* at 909 (same). "Not all of these factors are needed to demonstrate a merger; rather, these factors are only indicators that tend to show a *de facto* merger." *Menacho v. Adamson United Co.,* 420 F.Supp. 128, 133 (D.N.J.1976). *See also* 15 *Fletcher, supra,* § 7165.5 at 339 (describing these as "[f]actors which are indicative of a de facto merger....").

Brancorp's assertion that identity of ownership is a prerequisite to successor liability finds no support in the case law. Not only is identity of ownership one of several factors, but the cases uniformly hold that continuity, not uniformity, is the significant variable. One court stated,

> We think that the dissolution of [predecessor] and the organization of [successor] had but one purpose, and that was to avoid the contractual liability of [predecessor].... It is true that preferred stock in [successor] was issued to a number of persons who were not stockholders in [predecessor]; but the fact remains that the plant and business of the older corporation were taken over by the later one, the same organization was continued, and the names of the two corporations differ only by reason of the addition of the abbreviation 'Inc.'
>
> \*     \*     \*     \*     \*     \*
>
> [W]e deem the later organization merely a continuation of the former.

---

**7.** The transfer of assets for inadequate consideration is sometimes cited as a fifth exception. J. Phillips, *Product Line Continuity and Successor Corporation Liability,* 58 N.Y.U.L.Rev. 908 n. 4 (1983) (and cases cited therein). The plaintiffs assert that the defendants are liable under this theory as well. The plaintiffs depict the continuation and merger theories as three theories. Thus, they maintain that Maglia is liable as "the alter ego of Carla," "the continuation in business of Carla," and "the surviving corporation of the *de facto* merger of Carla with Maglia." Plaintiffs' Memorandum of Law in Opposition at 14. Together with the incorporation of the fifth exception, the transformation of two theories into

three explains the plaintiffs' contention that their amended complaint "expressly asserts six of the various theories of successor liability as bases for holding Carla Maglia liable for Carla Leather's debts...." Plaintiff's Memorandum in Opposition at 14.

**8.** *Ladjevardian v. Laidlaw-Coggeshall, Inc.,* 431 F.Supp. 834 (S.D.N.Y.1977), attempts to draw the distinction. According to that decision, whereas a *de facto* merger contemplates a selling corporation and a purchasing corporation, "a continuation accomplishes ... something in the nature of a corporate reorganization, rather than a mere sale." *Id.* at 839.

*Dairy Cooperative Association v. Brandes Creamery,* 147 Or. 488, 30 P.2d 338, 341–42 (1934), *quoted with approval in Peterson v. Harville,* 445 F.Supp. 16, 24 (D.Ore.1977), *aff'd,* 623 F.2d 611 (9th Cir. 1980). *Accord Brockmann v. O'Neill,* 565 S.W.2d 796, 798 (Mo.App.1978) (lack of complete identity of ownership, but successor held liable for debts of predecessor). The amended complaint's allegation that Carla's principals engaged Washington Druker's brother Bernardo "to assume nominal ownership of the company that had already been named Carla Maglia," Amended Complaint ¶ 44(a), is sufficient, at this stage, to plead continuity of ownership.

The defendants' contention that the plaintiffs cannot state any claim for successor liability because Carla had no viable business to transfer at the time of the alleged merger is also meritless. In fact, Carla's insolvency argues for the application of the various theories of successor liability. Where a transferor, like Carla, receives little if anything in exchange for its assets, it cannot respond to actions by creditors. Creditors must then pursue the transferee, here Maglia. *Cf. Successor Corporation Liability, supra,* 58 N.Y.U.L. Rev. at 915. ("[S]uccessor liability is unnecessary as long as the predecessor is available as a defendant.").

■ Even if the amended complaint does not thoroughly describe every indicator of a *de facto* merger, it clearly describes the wholesale transformation of one company, Carla, into another, Maglia. The amended complaint alleges that Maglia continued the enterprise of Carla with the same employees, assets, and management. It further states that these transactions reduced Carla to a "shell." Amended Complaint ¶ 20. Viewed in a light most favorable to the plaintiffs, these allegations are sufficient

to state a *de facto* merger claim against Maglia.[9]

The defendants have not challenged the plaintiffs' other theories of successor liability,[10] *see supra* p. 1535. The absence of any such challenge, in itself, mandates the rejection of the defendant's argument that the first cause of action does not state a claim for relief under any theory of successor liability.

■ Brancorp and Rubinroit next address the second and third claims charging them with conspiring and aiding and abetting the fraud through which Carla was transformed into Maglia. They first assert that successor liability extends only to the successor, in this case Maglia. They also argue that any liability on those claims can issue only to the extent of their participation in the fraud. These contentions ignore a fundamental principle of tort law: those who aid and abet or conspire in tortious conduct are jointly and severally liable with other participants in the tortious conduct, regardless of the degree of their participation or culpability in the overall scheme. W. Prosser, *Handbook of the Law and Torts* 292–93 (4th ed. 1971). *See also Valdan Sportswear v. Montgomery Ward & Co.,* 591 F.Supp. 1188, 1191 (S.D. N.Y.1984) (Weinfeld, J.) ("Allegations of a civil conspiracy ... are proper ... for the purpose of establishing joint liability by co-participants in tortious conduct.") The liability remains joint and several, notwithstanding the amount of any direct benefit conferred upon them through the fraudulent transaction. *Superintendent of Insurance v. Freedman,* 443 F.Supp. 628, 638 (S.D.N.Y.1977), *aff'd,* 594 F.2d 852 (2d Cir. 1978) (citing *Munzer v. Blaisdell,* 183 Misc. 777, 49 N.Y.S.2d 919 (Sup.Ct.N.Y.County 1944), *modified,* 269 A.D. 970, 58 N.Y.S.2d 360 (1st Dep't 1945); *Ballantine v. Ferretti,* 28 N.Y.S.2d 668 (Sup.Ct.N.Y.County

---

**9.** The defendants contend that Carla employees could legally accept employment with Maglia and that Maglia's purchase of leather goods and other inventory from Carla was proper. The propriety of this conduct is not in issue. Whether proper or improper, such conduct may support a claim for successor liability.

**10.** We note, however, that their argument regarding Carla's viability, *see supra* p. 1536, constitutes an objection to each theory of successor liability.

1941). Brancorp and Rubinroit do not challenge the sufficiency of the pleadings that state that they are conspirators and aiders and abettors, nor do they challenge the sufficiency of the allegation that the conduct alleged was fraudulent and, therefore, tortious.[11] They may be found liable to the full extent of that fraud, regardless of the nature or extent of their participation therein.

Alternate grounds exist for rejecting the defendants' contention that they are liable on the second and third claims only to the extent of their participation in the fraud. In particular, Fed.R.Civ.P. 12(b)(6), under which the plaintiffs move, does not authorize the relief they request. In order to survive a motion to dismiss under that rule, "it need not appear that plaintiff can obtain the particular relief prayed for, as long as the court can ascertain that some relief may be granted." C. Wright & A. Miller, 5 *Federal Practice and Procedure* § 1357 at 602 & n. 77 (1969) (citing *Norwalk CORE v. Norwalk Redevelopment Agency*, 395 F.2d 920 (2d Cir.1968), and *Lewis v. Dansker*, 68 F.R.D. 184 (S.D.N.Y.1974)). The defendants' motion to limit their liability on the second and third claims is denied.

### 3. The Claims Seeking Equitable Relief

Brancorp also challenges the relief requested in the first, and eleventh through thirteenth claims. Specifically, they contest that aspect of the first claim which seeks to substitute Meritum for Brancorp as the secured creditor in all of Maglia's property. They also challenge the request in the eleventh through thirteenth claims for a turnover of Brancorp's property to the plaintiffs. As noted above, the Court cannot dismiss these claims because the wrong relief is requested. Moreover, dismissal, even if possible, would be inappropriate at this juncture. Given the seriousness of the allegations with respect to the fraud and the defendants' participation therein, we cannot now specify what relief will be appropriate if the allegations are proven true.

We note, however, that there is ample precedent for awarding far-reaching equitable relief in circumstances similar or more egregious than those alleged herein. "Where the release or satisfaction of a lien is the result of fraud, accident or mistake, it will not inure to the benefit of a person acquiring an interest in the property who did not rely or advance anything on the faith of such discharge." *United States v. 168.8 Acres of Land*, 35 F.Supp. 724, 726 (M.D.N.C.1940). Instead, equity will restore the lien. *Id.* A fortiori, when a person acquiring an interest in property knowingly participated in a fraud that enabled him to acquire that interest, an equitable lien will issue,[12] the extent of which lien will vary with the circumstances. *See, e.g., Klinzing v. Blauw Bros. Inc.*, 160 N.Y.S. 631 (Sup.Ct. Monroe County 1916).[13]

---

**11.** The defendants do attack the fraudulent conveyance claims for failure to plead fraud with the requisite particularity. *See supra* pp. 1538–1539.

**12.** Brancorp asserts that Meritum waived its security interest in Carla's assets when it filed and voted its claim against Carla in the election of the Carla Trustee as an unsecured creditor. *See In re Carla Leather, Inc.*, 50 B.R. 764, 767 (S.D. N.Y.1985). In support of that contention, Brancorp cites a passage from *In re Matter of Russo*, 18 B.R. 257, 270 (S.D.N.Y.Bankr.1982), to the effect that

[a]lthough the mere filing of a secured debt as unsecured does not conclusively amount to a waiver of security against a bankrupt's property, *see* 2 Remington on Bankruptcy § 930, p. 407 (1956), a valid waiver will be found to have been made if, in addition for example,

the secured claimant votes the claim for the full amount in the trustee election. *Id.* at 108. *Id.* However, any waiver is only with respect to the estate of the bankrupt and those interested therein. "[W]hatever rights the creditor may have against third persons, or their property, are not waived by filing an unsecured claim...." 2 *Remington on Bankruptcy* § 930 at 409 (1956). Meritum did not waive its security interest as against Brancorp when it filed its claim as unsecured for purposes of voting for the Carla trustee.

**13.** In that case, there was substantial disappearance of an old and substitution of a new business. Defendants converted the property of the new business to their own use. That property could not be distinguished or separated. The plaintiff was entitled to a lien on the entire stock of the new business to the extent of its damages.

Likewise, a creditor of a corporation may follow the corporation's assets or property into the hands of a successor when there is fraud or collusion between the corporations. *Hurd v. New York and Commercial Steam Laundry Company*, 167 N.Y. 89, 95, 60 N.E. 327 (1901) (" 'The assets of a corporation are a trust fund for the payment of its debts, upon which the creditors have an equitable lien, both as against stockholders and all transferees, except those purchasing in good faith and for value.' ") (quoting *Cole v. The Millerton Iron Co.*, 133 N.Y. 164, 168 (1892) ).

■ Although we know of no case granting the precise relief requested, that fact cannot alone rule out a grant of certain equitable relief tailored to the circumstances of this case—nor can it assure such relief. Indeed, any determination with regard to the appropriate relief must await an examination of what other relief, if any, is afforded in this case. 35 *N.Y.Jur.*, *supra*, § 15 at 204. The motion to dismiss the first and the eleventh through thirteenth claims on the ground that equity will not afford the relief demanded therein must be denied. In this case "[e]quity [will] regard[ ] as done that which ought to be done." 35 *N.Y.Jur.* § 15 at 204–05 (1964).

■ Alternatively, Brancorp and Rubinroit move, pursuant to Fed.R.Civ.P. 12(f), to strike the allegedly excessive damage allegations in the various claims. Such allegations will be stricken from a complaint only when clearly excessive and unattainable. *Quinn v. Straus Broadcasting Group, Inc.*, 309 F.Supp. 1208, 1210 (S.D.N.Y.1970). Our previous discussion makes clear that that is not the case in this instance. The motion to strike is, therefore, denied.

### B. The Rule 9(b) Motions

Both Brancorp and Rubinroit move pursuant to Fed.R.Civ.P. 9(b) to dismiss the claims against them for failure to plead fraud with particularity. Rule 9(b) provides that "[i]n all averments of fraud ... the circumstances constituting the fraud ... shall be stated with particularity." Fed.R.Civ.P. 9(b). Mere conclusory allegations that the defendants' conduct was fraudulent are not enough. *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 114 (2d Cir.1982). Instead, the complaint must allege with some specificity the acts or statements constituting the fraud. *Ross v. A.H. Robins Co.*, 607 F.2d 545, 557 (2d Cir.1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 65 L.Ed.2d 1140 (1980).

This is not the typical securities fraud in which "the pleader must state the time, place and content of the false misrepresentations, the fact misrepresented and what was obtained or given up as a consequence of the fraud." 2A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 9.03, at 9–20 through 9–24 (1984) (footnote omitted). Rather, the amended complaint alleges a scheme to defraud creditors. In such a case, the complaint must allege the time, place, and nature of the defendants' conduct. In addition, since the plaintiffs have had an opportunity to discover considerable specific information, they should be required to plead those facts and events that give rise to an inference of scienter—knowledge of the improper aims of the fraudulent scheme.[14] *See Billard v. Rockwell International Corp.*, 683 F.2d 51, 57 (2d Cir.1982); *Ross v. A.H. Robins Co.*, *supra*, 607 F.2d at 558.

■ The amended complaint pleads the fraud in exquisite detail and specifies the actions of each of the moving defendants in furtherance of the alleged scheme. As to Rubinroit, the amended complaint alleges that he was Carla's principal spokesman, negotiator, and accountant at all of the Carla Meritum and Carla-Meritum-Brancorp meetings prior to Carla's dissolution. Rubinroit then performed the same function for Maglia in its subsequent negotiation's with Brancorp. Rubinroit thereby actively participated in the alleged fraud.

---

14. We need not decide whether Rule 9(b)'s pleading requirements need be relaxed when the plaintiff is a trustee in bankruptcy. The amended complaint passes muster under the strictest standards of pleading.

Rubinroit's alleged role in both sets of negotiations supports the inference that he knew of the fraud. Brancorp's knowledge and participation is equally plain from the amended complaint. Through discussions regarding the possible factoring of Carla's accounts, Brancorp allegedly learned of Carla's precarious financial position. Brancorp's subsequent knowledge of Carla's transformation into Maglia is detailed in paragraphs 20 and 21 of the amended complaint. Knowing of this improper transformation, it agreed to factor Maglia.

The amended complaint's factual allegations of Brancorp's and Rubinroit's knowing participation in the alleged fraud also satisfy Rule 9(b)'s requirements for pleading aiding and abetting, liability for which "attaches only when one 'has actual knowledge of another's improper scheme plus an intent to further that scheme (*i.e.*, scienter) and he has given substantial assistance to the primary wrongdoer....' " *Ingenito v. Bermec Corp.*, 441 F.Supp. 525, 534 (S.D. N.Y.1977) (quoting *Rosen v. Dick* [1974–75] Fed.Sec.L.Rep. (CCH) ¶ 94,786 at 96,604 (S.D.N.Y.1974)). The amended complaint also alleges facts from which the essential element of a civil conspiracy, an agreement involving each of the moving defendants, can be inferred. *See Powell v. Kopman*, 511 F.Supp. 700, 704 (S.D.N.Y.1981) ("A civil conspiracy is a combination of two or more persons to do an unlawful act by unlawful means or for an unlawful purpose.").

### C. The Motion to Strike or Disqualify Counsel

The defendants move pursuant to Fed.R. Civ.P. 12(f) to strike the allegations in the amended complaint concerning Carla's wrongful bankruptcy filing, *see supra* pp. 1532–1533, as scandalous, immaterial, and impertinent. In the alternative, they move to disqualify the plaintiffs' litigation counsel, Richard Ziegler and his firm, Cleary, Gottlieb, Hamilton & Steen ("Cleary"), pursuant to Disciplinary Rule 5–102(A) because Ziegler ought to testify about the disputed allegations.

### 1. The Motion to Strike

Rule 12(f) authorizes a court, on motion, to "order stricken from any pleading ... any redundant, immaterial, impertinent, or scandalous matter." Fed. R.Civ.P. 12(f). A motion to strike will be denied unless the alleged scandal or impertinency has "no possible relation" to the controversy, *Gleason v. Chain Service Restaurant*, 300 F.Supp. 1241, 1257 (1969), *aff'd*, 422 F.2d 342 (2d Cir.1970), or "has no bearing on the subject matter of the litigation...." *Fra S.p.A. v. Surg-O-Flex of America, Inc.*, 415 F.Supp. 421, 427 (S.D.N.Y.1976). The circumstances surrounding Carla's bankruptcy filing are both related to and have a bearing on this litigation. The statements in the amended complaint detailing the impropriety of that filing will not be stricken.

### 2. The Motion to Disqualify Counsel

Brancorp's alternative motion to disqualify the plaintiffs' litigation counsel must now be addressed. Such motions are often simply " 'common tools of the litigation process, ... used ... for purely strategic purposes.' " *Allegaert v. Perot*, 565 F.2d 246, 251 (2d Cir.1977) (quoting Van Graafeiland, *Lawyer's Conflict of Interest—A Judge's View (Part II)*, N.Y.L.J., July 20, 1977, at 1, col. 2). "Consequently, in ruling on such motions, courts must be careful 'to prevent literalism from possibly overcoming substantial justice to the parties.' " *Rice v. Baron*, 456 F.Supp. 1361, 1368 (S.D.N.Y.1978) (quoting *J.P. Foley & Co. v. Vanderbilt*, 523 F.2d 1357, 1360 (2d Cir.1975) (Gurfein, J., concurring).

Model Code of Professional Responsibility DR 5–102(A) (1975) ("DR 5–102(A)"), pursuant to which disqualification is sought, states,

> If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he

or a lawyer in his firm may testify in the circumstances enumerated in DR 5–101(B)(1) through (4).

DR 5–102(A). Those circumstances are

(1) If the testimony will relate solely to an uncontested matter.

(2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.

(3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.

(4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.

DR 5–101(B).[15]

In this case, the applicability of the exception in DR 5–101(B)(4) makes disqualification unnecessary.[16] Disqualification would "work a substantial hardship" on the plaintiff trustees within the meaning of that rule. The plaintiffs' counsel has worked closely with the Meritum Trustee since his appointment. Cleary served as the Meritum Trustee's counsel during his year long investigation and supervised the substantial discovery that uncovered the evidence which formed the basis for the complaint in this action. It has since conducted substantial additional discovery. Indeed, the Court understands that discovery is substantially complete, at least with respect to the claims in the amended complaint. Plaintiffs' counsels' knowledge of the facts underlying this suit is thus extensive and unique. *See In re Carla Leather, Inc.*, 44 B.R. 457, 475 (S.D.N.Y. Bankr.1984), *aff'd*, 50 B.R. 764 (S.D.N.Y. 1985). ("[The Carla Trustee] should avail himself of Cleary's investigation and its resulting expertise so to avoid the cost and time of finding and educating new counsel as well as to obviate possibilities of unnecessary confusion in the prosecution of [this action]."). *Cf. SMI Industries Canada Ltd. v. Caelter Industries, Inc.*, 586 F.Supp. 808, 817 (N.D.N.Y.1984) ("The Limbach firm's representation of defendant in the present action involves a complex set of legal and factual issue which the firm has been familiar with for many years."). Disqualification would work a severe hardship on any litigant in these circumstances. Here, where the plaintiffs are bankruptcy trustees, the hardship would be particularly acute. Disqualification would force two bankrupt estates, one with no resources, the other with finite resources, to sink deep into their pockets to pay new counsel to simply familiarize themselves with the litigation.

We recognize that the financial hardship and delay typically associated with the retention of new counsel is not the "substantial hardship" that DR 5–101(B)(4) envisions. *Grossman v. Commercial Capital Corp.*, 59 A.D.2d 850, 399 N.Y.S.2d 16, 17 (1st Dep't 1977). *See also MacArther v. Bank of New York*, 524 F.Supp. 1205, 1210 (S.D.N.Y.1981) ("[I]f the expense and delay routinely incident to disqualification satisfied the substantial hardship exception, that exception would soon swallow the rule."). Some hardship beyond that normally incident in changing counsel is necessary to invoke this exception. This case presents such a situation. The defendants' motion to disqualify plaintiffs' counsel is denied.

**D. The Challenges to the Trustees' Standing**

Brancorp and Rubinroit offer conflicting challenges to the standing of each trustee

---

15. "The Code has been adopted by the New York State Bar Association, and its canons are recognized by both Federal and State Courts as appropriate guidelines for the professional conduct of New York lawyers." *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (2d Cir. 1976) (citation omitted).

16. A Rule 36 "request to admit" certain facts about which Richard Ziegler might otherwise be required to testify is the subject of an ongoing discovery dispute. Thus, it cannot now be said that Ziegler's testimony is undisputed.

We need not decide whether Richard Ziegler ought to be called as a witness. Moreover, such a determination cannot be made on the current record.

to pursue this action. Brancorp asserts that the Meritum Trustee is not a proper party to this action. Rubinroit, on the other hand, contends that the Carla Trustee is not a proper plaintiff. Brancorp relies on *In re MortgageAmerica Corp.*, 714 F.2d 1266, 1275 (5th Cir.1983), in which a Fifth Circuit panel stated that section 544 of the Bankruptcy Code, 11 U.S.C. § 544 (1982),[17] the so-called "strong-arm provision," authorizes a "bankruptcy trustee to step into the shoes of a creditor for the purpose of asserting causes of action under state fraudulent conveyance acts for the benefit of all creditors...." *Id.* at 1275. The Court also noted that "the automatic stay under Section 362(a) [of the Bankruptcy Code] ... prevents a creditor from continuing to pursue a cause of action ... for a fraudulent conveyance." *Id.* at 1275. Brancorp asserts that the gravamen of the amended complaint is that the defendants fraudulently conveyed Carla's assets. This claim belongs to Carla. Brancorp argues that Meritum, Carla's creditor, is stayed from bringing this action.

■ Brancorp overlooks section 362(d) of the Bankruptcy Code, 11 U.S.C. § 362(d) (1982), which authorizes the bankruptcy court to "grant relief from the stay ... such as by terminating, annulling, modifying or conditioning such stay." *Id.* Pursuant to this section, the bankruptcy court has expressly modified the stay to permit the Meritum Trustee to prosecute this claim jointly with the Carla Trustee. *In re Carla Leather, Inc.*, No. 84–B–0700 (S.D.

N.Y.Bankr. Nov. 20, 1984) (order). Any issue of the standing of the Meritum Trustee has thus been resolved.

Since the Carla Trustee appears on behalf of Carla's creditors rather than on behalf of Carla, Rubinroit's argument that the Carla Trustee is estopped from suing in Carla's behalf because Carla's principal stockholders ratified the fraud that underlies this action need not be addressed. It matters not whether Carla could have maintained a similar claim outside of bankruptcy.

Rubinroit also asserts that *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972) (*"Caplin"*) precludes the Carla Trustee from suing those other than its immediate debtors on behalf of Carla's creditors. In *Caplin*, the Supreme Court held that a reorganization trustee under Chapter 10 of the Bankruptcy Act, 52 Stat. 883, 11 U.S.C. § 501, lacked standing to assert its creditors' claims against an indenture trustee. Brancorp contends that *Caplin* forecloses this action by a Chapter 7 trustee against itself and others not directly indebted to Carla. The *Caplin* Court's reasoning belies this contention.

■ That Court explicitly rested its holding on Congress' failure to authorize reorganization trustees to bring such actions. It noted,

> [W]hatever the decision, it is one that only Congress can make.... This does

---

17. Section 544 reads,

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained a judicial lien, whether or not such creditor exists;

(2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; and

(3) a bona fide purchaser of real property from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser at the time of the commencement of the case, whether or not such a purchaser exists.

(b) The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544 (1982).

not mean that it would be unwise to confer such standing on trustees in reorganization. It simply signifies that Congress has not yet indicated even a scintilla of an intention to do so, and that such a policy decision must be left to Congress and not to the judiciary.

Congress might well decide that reorganizations have not fared badly in the 34 years since Chapter X was enacted and that the *status quo* is preferable to inviting new problems by making changes in the system. Or, Congress could determine that the trustee in a reorganization was so well situated for bringing suits against indenture trustees that he should be permitted to do so. In this event, Congress might also determine that the trustee's action was exclusive, or that it should be brought as a class action on behalf of all debenture holders, or perhaps even that the debenture holders should have the option of suing on their own or having the trustee sue on their behalf. Any number of alternatives are available.

*Id.* at 434–35, 92 S.Ct. at 1688. Congress has not chosen to overrule *Caplin*, which continues to state the law with regard to the standing of reorganization trustees under Chapter 10. 5 *Collier on Bankruptcy* § 1106.01 (5th Ed.1985). However, as noted above, Section 544, the "strong arm" provision, provides ample statutory authority for a Chapter 7 trustee's assertion of creditors' claims against third parties. Rubinroit's objection to the Carla Trustee's standing is groundless, as is Rubinroit's.[18]

### III. *Conclusion*

The defendants' motions are denied in their entirety.

SO ORDERED.

---

[18]. The moving defendants assert that they have a right to know which claims are asserted by which plaintiff so that appropriate defenses may be interposed. As the Court understands this action, the Carla and Meritum estates are jointly pursuing all of the claims on both of their behalves and on behalf of all of Carla's other creditors. If the Court's understanding is incorrect, the plaintiffs should so inform it.